## UNITED STATES *v.* WAKEM & McLAUGHLIN (No. 2673)[1]

1. ERROR MUST BE ASSIGNED.

No assignment of error having been made as to the admission in evidence by the court below of certain affidavits, that point must be considered as waived. *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 579, T. D. 41436.

2. FINDINGS IN APPRAISEMENT REVIEW, SUFFICIENCY—EVIDENCE, SUFFICIENCY—INVOICE PRICES—EXPORT VALUE.

The finding by the court below "that there was not any real home market" in the country of exportation at the time the goods were bought and shipped is a sufficient predicate for appraisement at the export value under section 402(a)(1), Tariff Act of 1922. Such finding will not be disturbed if there is any substantial evidence to support it. Where it was shown that, owing to rapid depreciation of the currency of the country of exportation, an attempt to maintain a fixed price had failed, appraisement at the invoice price in dollars as the export value is affirmed.

### United States Court of Customs Appeals, May 29, 1926

APPEAL from Board of United States General Appraisers, Reappraisement Circular 35857

[Affirmed.]

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.

*Comstock & Washburn*, and *Dyrenforth, Lee, Chritton & Wiles* (*J. Stuart Tompkins* and *Marcus A. Hirsch* of counsel) for appellees.

[Oral argument May 11, 1926, by Mr. Igstaedter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The importers entered seven shipments of radial ball bearings at the port of Chicago. In entry No. 4078, the Government having

[1] T. D. 41692.

received information leading the collector to believe the goods were appraised at too low a figure, appealed to reappraisement. After a hearing, the single general appraiser found the dutiable value of these goods to be "invoice value multiplied by eighteen one-hundredths. Less 33⅓. Less 10 and 7½ per cent. Add packing." From this judgment, importer applied for a review by the Board of General Appraisers. In the six remaining entries the goods were appraised in conformity with the later information of the collector and appraiser and the several appeals from the appraisement of the local appraiser were by the importer. The single general appraiser in each of the six entries last above mentioned sustained the appraised value. The importers applied for a review of the resulting judgments; whereupon, the hearings on all seven entries having been consolidated, judgment was entered by the Board of General Appraisers reversing the judgments of the single general appraiser and sustaining the invoice values. From that judgment the Government appeals.

The goods in question were entered on the following dates: September 14 and November 8, 1923; February 4, February 16, February 16, January 29, and June 2, 1924, the last being a mail importation. They were exported, however, on various dates between August 8, 1923, and January 9, 1924, inclusive.

The goods in question are ball bearings manufactured in and exported from Germany. In its decision the court below made the following specific findings of fact:

1. The invoice price represents the export value on the date of shipment with discount of 98.40 per cent.

2. That there was not any real home market in Germany at the time of these purchases and shipments.

3. That the use of the multiplicator 0.18 was arbitrary and did not stabilize the currency exchange at the date of the purchase of the shipments in question.

4. That to the invoice prices should be added cases.

It is now contended by the Government, first, that the findings of fact found in the decision of the court below are not sufficient as a matter of law, and that the cause should be reversed and remanded for further findings, and, second, that the court below was in error in reversing the judgment of the single general appraiser fixing dutiable values as hereinbefore stated.

The facts as disclosed by the record are as follows: At the time of exportation of the goods in question the fixing of prices in Germany for ball bearings such as were imported here was controlled by an association of ball-bearing manufacturers, known as the *Deutsche Kugellager Konvention*, and which comprised some ten or eleven of the principal manufacturers of that class of goods in Germany, including the exporters of the goods in question here. This association had, for some time prior to the exportation of the goods in

question, been fixing, from time to time, unit prices of the various types of ball bearings, and price lists were issued by each member manufacturer, giving prices for the particular product of such manufacturer, according to such agreed unit prices, in German paper marks, the common currency of the country. The controlling syndicate regulated the price, from time to time, by agreeing upon a so-called factor or multiplicator, which was used by all the members and which multiplicator was changed when necessary, as the market rose or fell. By multiplying the catalogue price by this multiplicator, the manufacturer was enabled to obtain, approximately, a gold *mark* price. It was also the custom of the syndicate to issue yearly lists of domestic customers for this kind of goods, in which a certain progressive discount was allowed to the purchasers, the maximum being 33⅓ per centum, varying according to the gross amount purchased by such customer during the previous year.

About September 1, 1923, the German Government, finding the value of the paper *mark* to be rapidly deteriorating and being desirous of stabilizing the money of the country, established what was known as the *rentenmark*. Thereupon the syndicate issued a new multiplicator to accord with the attempt by the Government to stabilize its currency, and fixed it at 0.181. The export prices were also raised to some extent. The *rentenmark* was not available for commercial purposes until the last of December, 1923, and therefore business transactions, up to that time, had to be conducted in paper *marks*.

During the period when these exports were being made the paper *mark* was constantly decreasing in value; it was, however, legal tender and was used by the German people in paying their bills for domestic consumption. It was found, upon the establishment of the factor of 0.181, that the price thus arrived at was too high for the home market, and domestic purchasers placed no orders except those of necessity. As said by the witness, William Schede, "the business was practically dead." During this period the syndicate arrangement was to sell to purchasers, for American export, at the list price given in dollars, less discounts of from 98 to 98.67 per centum, the amount of discount being changed from time to time to accord with the condition of the market. The testimony shows that the American price has, during the period in question, remained stable and that the prices paid on the invoices involved here do not differ materially from prices theretofore paid for the same goods.

The adoption of the *rentenmark* stabilized the currency of Germany to a great degree, and prices thereupon began to decrease. Accordingly, the ball-bearing syndicate was in the position to, and did, reduce the gold factor on December 17, 1923, to 0.15, to 0.135 on January 7, 1924, and to 0.125 on February 12, 1924. It was only after the last reduction mentioned that orders for home con-

sumption began to be placed to any considerable, or to an ordinary, degree.

While the prices were established by the syndicate, it appears from the record they were not always followed. In the report of Assistant Customs Representative Max Richert appears a statement of Manager Gandorfer, of *Riebe Werk Aktiengesellschaft*, of Berlin. Mr. Gandorfer stated:

That the rate of exchange on September 28, 1923, was 160,000,000 paper marks per dollar, and went up to 242,000,000 on October 1, 1923, and that, due to fluctuating currency conditions in Germany during the months from August to November, 1923, no manufacturer in Germany actually did know what he was getting for the goods he at that time sold in Germany, and that to protect himself against the rapid changes in the value of the paper mark he had to add up to 50 per cent to inland prices.

In this same report Director August Riebe of the *Berliner Kugellager Fabrik*, of Berlin, was interviewed. The report states:

Called upon to explain the difference of 41 per cent between the thus ascertained home and export values, which difference will be still greater if the 33⅓ per cent discount is considered "an unusual discount," Director Riebe said: "When we sell goods to the United States, say, to the value of $1,000, we get paid for same $1,000, but if during the inflation of our currency we sold goods to a German buyer, the value of which, according to our price list, was, say, 1,000 marks, we actually received one-third of that amount." And he further said: "I will show you one of my accounts to prove to you that what I say is a fact." He showed me an account with a firm in Braunschweig, in which the sales in 1923 amounted to 67,703.29 gold marks, which was paid for in paper marks equal to 29,204.26 gold marks, resulting in a loss of 38,499.03 gold marks.

\* \* \* \* \* \* \*

Mr. Riebe stated "that in order to do business in Germany it was not always possible to strictly adhere to the discounts fixed by the convention" and requesting me to use this information confidentially he showed me the following order for 8,100 ball bearings from an automobile factory in Berlin:

JANUARY 29, 1924.

On the 28 instant we gave you an order for 300 complete sets of ball bearings. On this order, in accordance with arrangements made by you verbally with our Mr. G., you will allow us an extra discount of 20 per cent in addition to the discount fixed by the convention. You agree to allow us this extra discount of 20 per cent even if the present prices should be reduced by the convention.

Engineer Mempel of Friedrich Hollmann of Wetzlar, stated:

Through the terrible inflation of our paper mark we had to make new additions daily, and notwithstanding this fact we suffered great loss, which in some instances amounted to 75 per cent but very often to 50 per cent.

Fred A. Pertsch, president of the *Deutsche Kugallager Konvention*, stated, as to domestic sales during the period in question:

For instance, the firm of Friedrich Hollmann, Wetzlar, invoiced as per statement given by the same, whose correctness I had the opportunity to certify, during the months from September to December, 1923, to its biggest German dealer for goods delivered against orders taken before September 1, 1923, in all G. M. 45,000, of which, however, only G. M. 30,000 has been paid in full, as the customers, at an average, did not consent to pay more than two thirds of

the amount of the invoice. If, for instance, the invoices read for G. M. 3,000, the customer paid not more than G. M. 2,000 per month, whereas the firm of Friedrich Hollmann, when sending at the same period for G. M. 36,000 worth of goods to the United States, got in payment the full value of the invoice, say G. M. 9,000 per month.

Max Kaiser, sales manager of one of the members of the syndicate, stated:

In a very few instances, in which we sold to our German customers, were in small quantities; and we received in payment, as we expected, only from one-half to two-thirds of the price invoiced and it was understood with each sale that we were to agree on a definite price at the time of settlement of each invoice.

At the different meetings of the ball-bearings manufacturers it was discussed what course could be followed to prevent further large losses, resulting from the devaluation of our invoices during the 30 days between the delivery and the payment of ball bearings to our inland customers, and we found that there was no other course open to us than to invoice each sale at a nominal price, and agree with our customers on a definite price for each individual sale at the time of settlement of the respective invoice. In these settlements we did not receive nearly as much in gold value as we received from any sales to the United States or any other foreign country.

Objections were made to the introduction in evidence of certain of these statements which appear as affidavits in connection with said report, and complaint is made here of their admission. Error was not assigned predicated upon their admission and that point must accordingly be treated as waived. *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 579, T. D. 41436.

The only matter in issue in this case is the dutiable value of the goods at the time of exportation. That value was the foreign value or the export value, whichever was higher. Sec. 402 (a) (1), Tariff Act of 1922. The foreign and export values are thus defined by said section:

(b) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, * * *

(c) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, * * *

It is said the findings of the court below are not sufficient upon which to base a judgment that the invoiced export values should be taken for duty purposes. We are unable to agree with this contention. The second finding of the court is: "That there was not any real home market in Germany at the time of these purchases and shipments." If this be true, there was no foreign value, as defined by said section 402 (b), and the export value, if one existed, must be taken.

The remaining inquiry is whether such a finding of fact is justified by the record. Was there, at the time of exportation of this merchandise, a market value or price at which such or similar merchandise was fully offered for sale to all purchasers in the principal markets of Germany, in the usual wholesale quantities and in the ordinary course of trade? If there is any substantial evidence in the record in support of the finding of the court below on this subject, then such finding will not ·be disturbed by this court. *Kuttroff, Pickhardt & Co.* v. *United States,* 13 Ct. Cust. Appls. 17, T. D. 40861; *Sandoz Chemical Works* v. *United States,* 13 Ct. Cust. Appls. 466, T. D. 41365; *Metz & Co.* v. *United States,* 13 Ct. Cust. Appls. 412, T. D. 41340; *United States* v. *International Forwarding Co., supra.*

We believe there is substantial evidence in the record to the effect that during the time when the exportations here involved were being made there was no such foreign market value for the same. The excerpts from the record heretofore in this opinion quoted indicate plainly that, owing to the extremely disturbed financial conditions in Germany, the home market for such goods had disappeared. In addition, it fairly appears that the German producers, taking large losses from the rapidly falling *mark,* were selling their goods, in many instances, by individual bargains for what they could get for them, irrespective of the artificial standards fixed by their price-fixing syndicate. The same thing was happening which always occurs with such price-fixing arrangements—they operate successfully only when conditions are normal and people have the means to buy with. At other times the law of supply and demand alone operates. While the list price at which these goods were offered was fixed by the syndicate, they could be bought and were bought, as a matter of fact, at other prices. Even where they were sold for home consumption at list prices, it is evident, from the record, that such prices were, because of the constant decrease in the value of the *mark,* less than the prices received from American purchasers, where the goods were paid for in dollars.

The court below has found that the dutiable values here are the export and invoice values. There being substantial evidence in the record supporting this finding, the judgment of the court below is *affirmed.*